No. 31,133

THE GOLDEN BELT LUMBER COMPANY, *Appellee*, v. CHARLES A. MC-LEAN et al., *Defendants* (THE SECURITY SAVINGS AND LOAN ASSOCIATION, *Appellant*).

(26 P. 2d 274.)

Opinion filed November 11, 1933.

*John Hamilton Wilson*, of Salina, for the appellant.

*C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger* and *E. S. Hampton*, all of Salina, for appellee Golden Belt Lumber Company.

*Ralph Knittle*, of Salina, for appellee Salina Plumbing Company.

The opinion of the court was delivered by

DAWSON, J.: This case presents questions of precedence between materialmen's liens and those of the holder of mortgages on three town lots in Salina.

On November 18, 1925, one Wyatt, owner of the east half of lot 10, block 10, Riverside Park addition to Salina, sold it to Charles A. McLean. This lot fronts eastward and is bounded thereon by Ohio street, which runs north and south. At the time of the sale Wyatt

and McLean had an understanding that McLean should build a house on the lot, that McLean could give the Security Savings & Loan Company a first mortgage on it to obtain funds ($2,275) to build the house, and that Wyatt would accept a second mortgage to secure him for part of the purchase price. Accordingly Wyatt executed a deed to the lot in favor of McLean, dated November 18, 1925, and left it with the loan company pending completion of arrangements for the building loan. McLean went into possession of the lot forthwith and commenced to dig a basement and to construct a garage.

On November 24, 1925, the first and second mortgages as theretofore agreed to were executed; and on December 3, 1925, the deed from Wyatt to McLean and the first and second mortgages were filed for record and recorded by the register of deeds.

On November 24, 1925, the Golden Belt Lumber Company began the delivery of materials for the house. The lumber company furnished further materials as the progress of the work required, and it was paid in full therefor.

In January, 1926, while the above construction work was in progress, McLean purchased the east half of lot 9, and the east half of lot 11, which lay immediately on either side of lot 10. The terms of purchase were substantially the same as those whereby he had acquired lot 10—that the loan company should have first mortgages on these lots to secure payment of moneys to be advanced to build houses thereon, and that the vendor and former owner, one Snyder, would accept second mortgages to secure him for balance of their purchase price.

Accordingly, on January 22, 1926, Snyder executed a deed to the east half of lots 9 and 11 to McLean, and left it with the loan company to be delivered to him when first and second mortgages were executed. On January 25 McLean executed separate first mortgages of $2,600 each on those two lots to the loan company, and likewise second mortgages to Snyder. On the following day, January 26, 1926, McLean commenced to dig a basement on lot 11 and finished it within two days, and on February 1, 1926, he commenced to dig a basement on lot 9 and finished it by February 6.

On January 27, 1926, McLean entered into a single verbal contract with the Golden Belt Lumber Company for the building materials required for the construction of the two houses, one on lot 9 and the other on lot 11. On February 2 the lumber company

began delivering materials on these lots pursuant to that contract and made its last delivery on September 22, 1926. All these were paid for by McLean, except a balance of $237.05. To insure payment of this balance the lumber company accepted McLean's note, and on December 3, 1926, filed a mechanic's lien on the three half lots 9, 10 and 11.

The deed from Snyder to McLean and the first mortgages executed by McLean to the loan company covering the half lots 9 and 11 were recorded on March 8, 1926. The second mortgages from McLean to Snyder were not recorded until December 15, 1926. The lumber company had neither knowledge nor notice of any of the loan company's first mortgages until they were recorded.

On September 1, 1926, when the three houses had progressed to the proper stage of completion, McLean entered into a single contract with the Salina Plumbing Company to install water and sewer connections in the three houses and to make the necessary connections at the rear of each house. The plumbing company completed this work by September 17, 1926, and its bill therefor, $285, being unpaid, on January 8, 1927, it filed its lien on the three half lots.

Some time in October, 1926, under an oral contract with McLean, R. A. McConnell installed a furnace in the house on the east half of lot 9 and another furnace in the house on the east half of lot 11. The agreed price of the former was $140, and $135 for the latter. In default of payment, McConnell filed his lien therefor on December 17, 1926.

To determine the proper order of precedence for the enforcement of these liens and to foreclose them, the Golden Belt Lumber Company, plaintiff, brought this action, impleading as defendants the loan company, the second mortgagees, the Salina Plumbing Company, and McConnell.

The pleadings of the parties and the evidence of the parties developed the facts substantially as outlined above, and the trial court's findings of fact were to like effect.

The court held that lots 9, 10 and 11 constituted one tract of land for the purpose of the mechanics' liens and that they attached to the whole of it. These liens were given precedence over the loan company's mortgages. The second mortgages were placed last of all, but the holders thereof have dropped out of this lawsuit, and that feature of the judgment is of no present concern.

The loan company appeals, contending first that the court erred in its ruling that the three lots constituted a single tract for the purpose of subjecting it to the liens given precedence over the mortgages held by the appellant loan company. On that point counsel for the plaintiff lumber company say in their brief:

"Although the plaintiff filed a lien upon the east half of lots 9, 10 and 11, block 10, Riverside Park Addition to the city of Salina, Kansas, at the trial in the district court it did not insist upon a lien upon the east half of said lot 10, although the other materialmen who had furnished material for the construction of the three houses on said lots did maintain their claims for liens upon all of said lots. Plaintiff does claim a lien on the east half of lots 9 and 11, Riverside Park Addition to the city of Salina, Kansas, and claims that said lien is superior to the liens of the loan association, and that it is entitled to priority over said mortgage liens."

The lumber company made but one contract with McLean to supply the materials for the houses on lots 9 and 11. All these materials were paid for except a balance of $237.05. Plaintiff filed but one lien on the lots to secure payment of this balance. Why should it file two lien statements? The lumber company had no means of knowing how much of the material delivered under this single contract was used in building the house on lot 9, nor how much in the house on lot 11. It was under no duty to keep track of such details.

This court has held that where a lumber company's contract for materials for two or more buildings on contiguous lots is single and entire, a single lien to protect the materialman is sufficient. In *Mulvane v. Lumber Co.*, 56 Kan. 675, 678, 44 Pac. 613, it was said:

"And we do not know of any legal objection to a single contract for furnishing materials for two or more buildings on several contiguous lots constituting a single tract or parcel of ground. (*Carr v. Hooper*, 48 Kan. 253, 257; *Van Laer v. Brick Works*, ante, p. 545, 43 Pac. 1134; *Meizell v. Griest*, 1 Kan. App. 145, and cases cited.) This case is distinguishable from *Lumber Co. v. Hegwer* (1 Kan. App. 623), 42 Pac. 388, where there were four separate contracts for the erection of four dwellings upon four contiguous lots."

Later cases approving the same rule are *Lumber Co. v. Smith*, 84 Kan. 190, 194, 29 Pac. 398; *Lumber Co. v. Russell*, 93 Kan. 521, 133 Pac. 819.

In *Stoltze v. Hurd*, 20 N. D. 412, Ann. Cas. 1912C 871, it was held that where two persons owning adjoining lots made a single contract for the erection of a building thereon, "the lien must follow the contract," and that a person who supplied materials for the

building under a single contract was entitled to a joint lien on the building and on both lots, but was not entitled to separate liens on both lots.

In our own case of *Sash & Sales Co. v. Early,* 117 Kan. 425, 232 Pac. 232, it was contended that materials furnished under separate contracts for the improvement of a single building might supply the basis for a single lien, but this court held to the contrary, citing authorities.

In *Lumber Co. v. Hegwer,* 1 Kan. App. 623, 42 Pac. 388, building materials were supplied for four separate houses upon four contiguous lots, under four separate contracts. The lumber company filed a single lien on the four lots for the amount due. In an effort to save the lien it was contended on its behalf that there had been but a single contract for the furnishing of the materials for the four houses. But that vital question of fact was resolved against the lien claimant, and the lien was held invalid.

It does not appear that hitherto this court has been called upon to determine whether a single lien may be imposed upon noncontiguous lots for materials supplied under a single contract. Yet the books are full of such cases, and two views of that question are apparent. (10 A. L. R. 1026 *et seq.;* 75 A. L. R. 1328 *et seq.*) In *Bohn Sash & Door Co. v. Case,* 42 Neb. 281, under a statute not materially different from our own, a contractor undertook to construct fifteen houses' on two separate and noncontiguous tracts of land in Omaha, ten houses on one tract and five on the other. The contract was single and entire. The agreed price was $51,650. The subcontractors who furnished the lumber for the buildings on the two tracts filed a single lien to protect the amount due them. Touching its validity the court said:

"It is insisted, however, that there should have been filed separate claims for liens, in each of which should have appeared a definite description of the property to be affected by such lien, and that a claim for a lien cannot properly be filed *in solido* against distinct properties not contiguous . . . It is the entirety of the contract and not the location of the property which must determine whether a claim or claims shall be filed for a lien or liens. A joint lien upon several buildings, situated upon different lots owned by the same person, could not be maintained where a separate contract had been entered into by the owner and contractor; for by the several contracts the inference would be that a separate account should be kept with each building. Not so when the contract covered several buildings to be erected for a gross sum without regard to the cost of each. It may result to the owner of separate

properties to be improved under a joint contract that hardships will be caused incidentally by the fact that a lien may be filed against all the parcels *in solido,* whereby sales of the several lots separately may be prevented. Against this it is easy to guard by avoiding a joint contract, or, if one is used, the contingency mentioned may be guarded against by requiring that the material to be furnished or labor for each building to be erected shall be shown by distinct accounts kept with that purpose in view. . . . The views above expressed have received approving consideration in *Chadbourn v. Williams,* 71 N. Car. 444; *Sergeant v. Denby,* 87 Va. 206; *Lewis v. Saylors,* 73 Ia. 504; Jones, Liens, sec. 1317, and authorities therein cited." (pp. 300, 301.)

In *Burel v. East Arkansas Lumber Co.,* 129 Ark. 58, it was held:

"A lien exists in favor of a materialman upon two or more lots, where the materials are furnished under a single contract for buildings to be constructed upon two or more lots which are not contiguous." (Syl. ¶ 1.)

This court has not overlooked the cases cited by appellant nor those cited in the A. L. R. notes, supra, which hold that a single mechanic's lien is not sufficient, though work or materials have been furnished under an entire contract, if the lots on which the buildings are erected are not contiguous. We can see no fundamental distinction between a statutory lien and a lien created by a mortgage contract. In the latter sort of lien nothing is more common than a single mortgage lien covering noncontiguous tracts of land. We see no reason to impose a judicial handicap on the business of this state which would have the effect of forbidding mechanics and materialmen from undertaking the construction of the improvement of two or more separate projects under a single contract, nor any reason for imposing on them the onerous burden of keeping tab of the amount and value of the materials used on each separate project when they are supplied under one contract. On this point we agree with the supreme court of North Carolina, where a mechanic's lien claim was attacked on the ground that the lien was on two lots separated by a street.

"We do not see that this is material under the circumstances of this case. If the two lots had been sold or mortgaged to different persons, it might be necessary as between them, and to settle their respective liabilities to contribution, to ascertain, as well as could be, the value of the materials used on each lot. But the lien of the materialman for his whole debt would cover both lots. When materials are furnished under a single contract for buildings put up on two lots, it cannot be expected of the vendor to know how much is used on one of them and how much on the other." (*Chadbourn and another v. Williams & Mechanics' Buil. & Loan Asso.,* 71 N. C. 444, 448.)

In our own case of *Lumber Co. v. Blanch,* 107 Kan. 459, 192 Pac. 742, it was held:

"A single mechanic's lien may cover adjacent lots on opposite sides of an alley if all the lots on both sides of the alley are used as one property. . . . " (Syl. ¶ 3.) See, also, 2 Jones on Liens, 3d ed., § 1317, pp. 544, 545.

In view of the foregoing authorities, the appellant loan company's objections to the judgment can readily be disposed of. The lumber company's bill for materials for the construction of the two houses on lots 9 and 11, being supplied under a single contract, the balance due thereon was sufficient basis for the imposition of a single lien, notwithstanding those lots were noncontiguous. The inclusion of lot 10 in the lumber company's lien statement did not affect the validity of the lien on lots 9 and 11. As to lot 10, we construe the observation in appellee's brief quoted above as conceding that the judgment may be modified so far as it is concerned.

Touching the Salina Plumbing Company's lien claim, the contract for its services and supplies was single and entire for the three houses on lots 9, 10 and 11, and its single lien therefor was valid and enforceable as filed.

Touching McConnell's lien claim for the furnaces installed in the houses on lots 9 and 11, it should be noted that while the contract for their installation was single, the subject matter was clearly severable, it being stipulated therein that the furnace to be placed in the house on lot 9 was one valued at $140, and the other for the house on lot 11 at $135, and in consequence the lien award should be apportioned on lots 9 and 11 accordingly. (*Hoagland v. Magarrell,* 115 Wash. 259.)

Passing to other matters urged against the judgment, the contention is made that McLean did not have permission to go into possession of lot 10 and commence work thereon prior to November 24, 1925, the date he executed the mortgage to the appellant loan company. We think no one but the vendor Wyatt could have complained of McLean's conduct in that respect; and in any event the rights of these lien claimants were not affected thereby. McLean did take possession and work was begun on lot 10 before appellant's mortgage was executed, and the statute plainly declares liens for materials and labor furnished or performed in the erection or improvement of land "shall be preferred to all other liens or encumbrances which may attach to or upon said land, building, or im-

provement, or either of them, subsequent to the commencement of such building, the furnishing or putting up of such fixtures, or machinery, the planting of trees, vines, plants or hedge, the building of such fence, footwalk, or sidewalk, or the making of any such repairs or improvements." (R. S. 60-1401.)

It cannot be gainsaid that appellant's mortgage did not attach until after the commencement of the improvement on lot 10; and it likewise appears that appellant's mortgages did not attach to lots 9 and 11 until after the improvements on those lots were begun. In *Kantzer v. Southwest Home Investment Co.*, 128 Kan. 401, 402, 278 Pac. 53, it was said:

"It is well established, of course, that the liens of mechanics' lien claimants date from the beginning of the work and are prior to that of a mortgage later executed and recorded. (R. S. 60-1401; *Mortgage Co. v. Weyerhaeuser,* 48 Kan. 335, 340, 29 Pac. 153; *Nixon v. Cydon Lodge,* 56 Kan. 298, 43 Pac. 236.)"

See, also, *Security Stove & Mfg. Co. v. Sellards,* 133 Kan. 747, 3 P. 2d 401.

The other matters urged against the judgment have been carefully considered but require no further discussion.

The cause will be remanded to the district court for modification in the following respects: The lumber company's lien should attach to the east half of lots 9 and 11 and not to lot 10. McConnell's lien for the furnaces should attach to the east half of lots 9 and 11 in the proportions of $140 and $135. The judgment in respect to the plumbing company's lien against all three of the lots is affirmed *in toto*. All these liens take precedence in the order of their filing, and so much of the judgment as gives them precedence over the appellant loan company's first mortgages is affirmed.

When so modified the judgment will be affirmed. It is so ordered.

BURCH and HUTCHISON, JJ., not sitting.